Vecinos para el Bienestar de la Comunidad Costera et al Petitioners versus Federal Energy Regulatory Commission. Mr. Matthews for the Petitioners, Mr. Kennedy for the Respondent, Mr. Longstreth for the Intervenors. Mr. Matthews, please, please feel free to continue. Thank you, Your Honor. So case 1045 concerns the Rio Grande LNG export terminal and the associated Rio Bravo pipeline. Even after the, or if the approved design changes are included, the Rio Bravo terminal remains the second largest LNG terminal and the Rio Bravo pipeline is the highest capacity pipeline project FERC has ever approved. And these combined projects based on the EIS will emit more than 9 million tons of greenhouse gases every year, making it one of the largest single sources of emissions in the country. Before I get into the Rio Grande specific issues, I just wanted to quickly speak to the social cost of carbon concern and the issue about 1502.22, which has been now renumbered to 1502.21. The key language in the amended regulation, it remains the same. It still says that if an agency is lacking information regarding adverse impacts, the agency must provide an evaluation based on methods generally accepted in the scientific community. And that term, which used to be 1502.24 is just renumbered, but still applies in the new reg. So even if we do prevail here, there is a remand and assuming that the new regs stay on the books, I know there's a lot of litigation challenging the CEQ amendment of the NEPA regs. All of our claims on this carbon would be carried forward under the new regulation. And are you aware of, and do you have a response to the commission analysis that council in the previous case referred to in the Dominion case about the eligibility of the reg to... I am not aware of any prior commission order that specifically addresses 1502.22. I didn't quite catch the site that council announced there, but the Dominion case, the 2018 Dominion FERC order that was cited in the certificate orders here and the rehearing orders here, only mentioned 1502.22 in the dissent when Commissioner Glick is saying, I still think we ought to be using social cost of carbon because of 1502.22. I just was not expecting to go there, but pulled it up now. And I don't see a discussion of 1502.22 there. And 1502.22 was not discussed in any of the FERC certificate orders at issue in today's cases. It wasn't discussed in any of the rehearing orders in any of the EISs, nor was it discussed in any of this court's prior cases addressing social cost of carbon, which is I think one of the key factors that distinguishes this case from earth reports and the unpublished decisions that have held that on the records in those prior cases, that FERC was not required to use a social cost of carbon. Here we are arguing that the records in these cases demonstrate that the predicates for 1502.22 are satisfied, that FERC has conceded in the case after the remand in earth reports, I mean, after the remand in Sable Trail, which is a Sierra Clubbee FERC case, that the social cost of carbon is generally accepted in the scientific community. FERC has never disputed that, and in the records in these the social cost of carbon is built on an assessment of actual physical impacts, as we pointed out in our briefs. FERC even admitted that if you wanted, you could back out just the assessment of physical impacts and not do the monetization step in the social cost of carbon. So, you know, here we have FERC conceding that the predicates for 1502.22 are distinguished in this case from earth reports. I'll also note that Appalachian Voices held that we had... I mean, it didn't mention the regulation, but it responded to your arguments. We believe that it does not. You know, the point of 1502.22 is that, you know, although an agency generally has discretion as to choosing the appropriate methodology, 1502.22 sets a floor where, in the absence of any other analysis, FERC can't refuse to use a method that is generally accepted in the scientific community, even if... I think the reg says they have to do something. And here they did nothing. It doesn't have to be social cost of... We agree. We agree that nothing in the reg specifically requires... Did they do anything? And here FERC concedes that they did not evaluate the significance of climate emissions because FERC believed they did not have the tools to do so. Which I think the explicit concession that they did nothing is why we think 1502.22, plus the concession that social cost of carbon was generally accepted, require a social cost of carbon here. In other cases, we do not believe that social cost of carbon would always be required. Generally accepted is one requirement, but that it be applicable to what they're doing must also obtain, right? I mean, it's got to lead to something or have information relevant to the decision that they're making. Maybe there is something out there other than a social cost of capital. I don't know. And we completely agree that if FERC had done some other method, that this would be a very different case. Our argument hinges on the fact here that FERC explicitly states that they did not use any method to evaluate the significance of greenhouse gas emissions. So if we send this back to them, their task is to do something, not necessarily do anything regarding SCC. Right. We do think that it would be appropriate to put a gloss on it that says, if you can't think of anything else to do, then you've got to do social cost of carbon. But certainly the door would be open. But it's not something that just doesn't apply to at a project level. If you've got something that is the equation to be used for evaluating the burn rate of rocket fuel, it's just irrelevant to this task. And if there's something about SCC that makes it irrelevant, then I don't see why, just because you're urging it, that it qualifies. And I would rest on our briefs. But this is what there's, which is to say, it was issued by the tech document for use in rulemaking. And it's not really adapted to project level analysis. And with an eye on the clock, I'll rest on our briefs for explaining, we believe that FERC hasn't provided any reason why it doesn't work here. That although it was developed in rulemaking, that FERC hasn't explained why that's the distinction with a difference. All right. Let me go back to the ships question just to make, because we glossed over that. You weren't aware of the FERC making the argument. This is 48 in 20-1045, page 48 of the red brief. Vicinos notes that the commission did not discuss emissions migration from vessels servicing the project. The commission lacks jurisdiction over such vessels, citing a statute vesting the commission with jurisdiction over LNG terminals. And another saying LNG terminal does not include waterborne vessels. The same point appears at 39 in 20-1043 and 44. So there's the argument. So we would draw a distinction between- Which we've said that, Judge Rogers was quite clear on that. We believe that there's a distinction between FERC's authority to regulate. I mean, that argument was made in the context of saying that whether FERC could impose additional mitigation measures on vessels, regardless of whether FERC can, it's clear that the authorizing these projects and operation of these terminals in these locations will cause vessel traffic to this terminal and that that vessel traffic will affect the surrounding communities. And the Department of Energy does not perform any analysis about the surrounding communities or about the infrastructure. So we believe that FERC does have the obligation to consider- Did they do any EIS? Yes. And in the EIS, they did consider the air emissions from vessels, but they didn't consider the contribution of those air pollutions to ozone formation. So why didn't you complain to DOE? Oh, no. DOE has not done that. FERC did that. That's my question. I was not clear whether DOE had issued any EIS with regard to the traffic. DOE has adopted FERC's EIS. DOE's discussion of the project did not conclude any analysis of local non-greenhouse gas air pollution. So they didn't do any independent document? That's correct. DOE does not assert jurisdiction over the ozone-forming pollution coming from vessels. Thank you. One closing note on social cost of carbon is the Appalachian Voices case held that petitioners had waived their arguments about social cost of carbon by failing to challenge FERC's arguments in the opening brief. So not only is Appalachian Voices an unpublished decision, it involves a waiver argument that doesn't apply here. We'll save my last 30 seconds for rebuttal. Let me ask a question. Oh, sorry. Just going back for a moment to the vessels. How does EARTH reports bear on that case? How is that distinguished? EARTH reports considered arguments about whether FERC adequately addressed ballast water impacts and other impacts of vessels. EARTH reports solely said that FERC didn't have jurisdiction to look at where the gas was coming from or the use of the gas after it had been exported by vessels overseas. But we had claims about the substance of FERC's analysis of vessel traffic, including ballast water discharge, et cetera, there. And I don't believe that there was any argument in that case or any aspect of the decision that held that FERC didn't have to consider ballast water impacts or anything. Well, here's the sentence. So maybe you can explain this in context. It says, because DOE alone has the legal authority to authorize Dominion to increase commodity exports of LNG, the challenge orders here too are, quote, not legally relevant, the legally relevant cause of these indirect effects, close quote, and the commission did not need to consider them in its NEPA review. I believe that that statement in EARTH reports was solely about combustion of gas overseas and about the production of where the gas was coming from. I apologize that I don't have the case language in front of me. Again, it's the sentence before, petitioner's contentions regarding the indirect effect of increased exports on upstream natural gas production resemble those rejected in the Freeport case. And while these cases did not address whether NEPA reaches the effects of emissions arising from the transport and consumption of exported natural gas was focused on the transport, this indirect effect similarly, quote, cannot occur unless the greater volume of LNG is shipped from the terminal and enters the international marketplace. And that goes on to say, because DOE doesn't have legal authority over that, it doesn't enter into their NEPA analysis. So in practice, FERC and DOE maintain a split in jurisdiction where DOE considers the greenhouse gas emissions of ocean going vessels during the majority of their journey. But that what the non-greenhouse gas pollutant emissions close to port in the United States are not something that DOE considers. And there's something that FERC has always considered. So when they deal with the remote emissions. That's correct. They do an EIS then? No, DOE has never done its own EIS. DOE always tears off of FERC's EIS. And I realize we were getting a little bit afield of some issues here. DOE has sometimes supplemented FERC's EIS with some non-NEPA documents, but DOE has never done its own EIS. Judge Wilkins, did you have a question? With respect to environmental justice, the challenge you have that they failed to take a hard look at environmental justice impacts. You opened in your opening brief by essentially arguing that FERC proceeded under a false premise that because the communities in the vicinity of the projects were exclusively minority and low income, they couldn't be disproportionately impacted by these projects unless there were factors unique to their populations that rendered the project's effects particularly harmful. But it seemed that you dropped that argument in your reply brief. Am I missing something? Can you articulate where you've landed with your challenge here? Yeah. We did not intend to abandon that claim in our reply brief. Instead, I think that our arguments about FERC's failure to define the affected community are how we discussed that claim in our reply brief, that FERC defined the affected community using a two-mile radius to the communities identified by that two-mile radius, plus everybody outside of that is all an environmental justice community. There's no disproportion here. And our claim is that when addressing whether or not impacts on environmental justice communities are disproportionate or not, you need to juxtapose the actually affected community with some broader reference community. And that by defining the affected community arbitrarily narrowly, that also skewed what FERC used as a reference community. FERC has acknowledged that the actual effects of these projects related to air pollution will extend far beyond two miles. FERC's cumulative impact analysis says they're actually felt up to 31 miles away. And the calculations FERC used in its belated ozone analysis rests on a calculation of both impacts six miles away. So our claim is that if you define the affected community appropriately with using a broader standard, then you would need to look farther away for a reference community, perhaps looking at all of Texas or at least some sort of broader region. And that once you use that broader reference community, you will see that we expect, FERC hasn't done this analysis, that the broader reference community would have lower environmental justice populations as a proportion than the community affected here. And that's consistent with the EPA guidance that FERC purports to rely on, where EPA has cautioned that when you're evaluating impacts along the U.S.-Mexico border in Texas, so much of the nearby communities are likely to be minority communities that the appropriate comparison for your environmental justice analysis should look broader. And EPA suggests that that should often be a comparison with all of Texas. Okay. Thank you for that clarification. Okay. Thank you, Mr. Matthews. We'll give you a little bit of rebuttal time. We'll hear from the commission now, Mr. Kennedy. Good morning, Your Honors. Robert Kennedy on behalf of the commission. I'll just pick up on the environment. The commission's analysis here was consistent with the EPA guidelines. It looked, the EPA guideline, it looked at a two-mile radius around the project, determined that all those communities were environmental justice communities. And that is consistent with the EPA guideline that says, you know, the further away you look, the more the impacts dissipate. So you should really concentrate on where the bulk of the impacts are going to be. The commission found that because all these communities were environmental justice communities, the impacts were spread uniformly. So then the task was to look at these communities, look at their demographic makeup, and see whether there's any characteristics of those communities that would amplify an impact in a manner that hadn't already been considered by the commission in its environmental analysis. And it went through that step with respect to ozone, which was the primary concern with respect to health impacts. And it found that given the demographics of the population, we would not expect any greater impact than would normally be expected. On the socioeconomic side, tourism was the main thing that was identified during scoping, and it's one of the things discussed in petitioner's brief. The commission acknowledged that these are low-income communities with a high unemployment percentage. It acknowledged that tourism is an important industry to these specific communities that are going to be impacted. It went through, looked at all the different types of tourism, ecotourism, bird watching, beach going, and found that while with respect to the project in general, while the timing of tourism visits come, the overall number shouldn't change. It did acknowledge that if we look cumulatively at all three projects, then maybe there might be a moderate impact to tourism. But it did consider this issue and looked specifically at whether it would, how it would impact this community, these affected communities, given their demographic makeups. And we would submit that that satisfies the purpose of the environmental justice analysis. Where did the two miles come from? I'm sorry? Where did the two miles come from? I think that was just the commission's assessment, that that's where the bulk of the impact was felt, and therefore focused on those particular communities. I don't think there's a particular standard that's laid out in any of the CEQ or EPA guidance documents that's sort of left to the discretion of the agency, and that was the choice of impacted population. And Mr. Matthews is correct that the commission did acknowledge that Pozona is a regional issue, and it did look at it as a whole, mirrors the demographics of the communities within this two-mile radius. So there's, we don't believe this is a case where there's some environmental justice community out there that the commission missed, or there's some specific set of information that the commission didn't consider that would demonstrate in some way that the otherwise disclosed impacts are on these communities. With respect to the social cost of carbon and regulation 1502.22, now 21, I think we're in agreement with petitioners that the operative language is generally the same. And yes, it is not cited in our brief or these orders, but the fundamental point of the committee... Why not? Why isn't it cited in the brief at all? Because especially in the Rio Grande case, it's the entire argument is rested on the regulation. Well, I think because the fundamental point of the commission's discussion is that this is not a generally accepted tool for use in project specific analyses. Again, while it may be possible to use it to look at broad global and regional impacts under certain socioeconomic conditions, it doesn't look at just the impact of a particular project. And there is no scientifically acceptable scientific agreement as to the appropriate discount rate to use, nor is there a scientifically accepted standard by which the commission could judge that a specific dollar amount that may come out of the tool reflects a significant climate change impact. So the commission in this order, in the Rio Grande rehearing order... Now, I mean, tying it to the regulation. Has the commission said any of this, tying it to a regulation anywhere in this order? So yes, in the Rio Grande rehearing order, in discussing the social cost of carbon issue, the commission essentially says, you know, we've discussed this a number of times before, and it cites to the Mountain Valley order, which is, that's footnote 308 of the Rio Grande hearing order, which is JA 157. This was the order that was under review and affirmed in the Appalachian Voices case. And in that order, at footnote 769, the commission explains that that case involved downstream greenhouse gas emissions. And the commission noted that, you know, we've discussed in here how there's no meaningful threshold for determining significance of GHG emissions using the social cost of carbon. We believe that the discussion herein is consistent with the procedures for addressing incomplete or unavailable information, and it cites what was 502.22. So the commission has disclosed that... The EIS makes clear that there's some uncertainty as to the scope of these climate change impacts. It acknowledges that it will have greenhouse gas emissions, that that will affect global warming. In other words, I think I understand what you're saying, is if I wanted to figure out what the commission thinks about this regulation's applicability in the greenhouse gas context, what I would do about this regulation, not generally about whether it's scientifically accepted, but how this regulation interrelates with the question, or a precursor regulation that may be a different number or something, but in substance the same regulation, what I would do is go to the decision that's cited in footnote 308 of the rehearing order, and then if I look at that decision, I'll see a reference to the regulation. Correct. The rehearing order in that footnote. Yes, you're right. It is the rehearing order from the Mountain Valley proceeding, and it's footnote 769 in that Mountain Valley order. You'd point me to that instead of the Dominion order. Only because I know that the Mountain Valley order was referenced and incorporated, I would say, in the Rio rehearing order. Okay. Again, I would also add this specific argument was raised. 1502.22 was one of the principal provisions relied upon by Sierra Club in the 2016 case, which found that the commission reasonably declined to use the social cost of carbon. So, this issue has been before the court. Was the regulation urged in that case? It was. Yes, that was one of Sierra Club's principal arguments. Which case is it you're referring to? It's the 2016 Sierra Club case. Is that the Sable Trail one? No, it's a separate one. It's also an LNG case involving, I believe, the Corpus Christi case. Is it Freeport? Let me find you the site, Your Honor. It is 672, Federal Appendix 38. It was raised in the briefing on that by Sierra Club. And then, the court just held that Petitioner's arguments have no merit, mainly relying on the Earth Reports case. I see my time is up. So, if I just have a moment getting back to where we started this morning with respect to what's going on with these. Well, let's just stay where we are for a moment. On the discount rate, the EPA has given guidance on that, right? I think it's the EPA. Just run these three different discount rates. I believe it's OMB that has given that rate. EPA has advised the commission in another proceeding, which is cited in our brief, that the tool may not be appropriate for use in project-specific reviews. And it has advised the commission that there is a dispute as to the disagreement, I should say, as to the appropriate discount rate. OMB, yes, in the circular that petitions point to, it does say, here's a couple discount rates. Use them all. Put the numbers out there. And the commission, the Earth Reports court said, the idea that the tool can spit out wildly divergent numbers based on the discount rate that you use only supports the commission's point that it's not reasonable to use, the commission's position that it's not reasonable to use in a project-specific analysis. Where's the EPA communication to FERC saying this? So, it is cited in, it's quoted in footnote, excuse me, in paragraph 104 of the Rio rehearing order. And then, yeah, that's where, and this is stated in a number of orders. I don't know that I can trace or trace it back to the first indication, but that's where it is in this case. In paragraph, I'm sorry, paragraph 104 of the rehearing order. The rehearing order with respect to greenhouse gas, right? Yes. Yes. Sort of with respect to the original question of where we are in this case, given the, given the moving pieces, I agree that, so my understanding- Can you give me a second? I'm looking at paragraph 104. Here it is. Sure. EPA states, and that's okay, no consensus on the appropriate discount rate. That's one point. The tool does not measure, but EPA states does not apply to points two and three. No, correct. Just that there's a, there's a disagreement as to the appropriate discount rate to use with respect to the, with respect to the tool. And there, and there it cites to the footnote 309, the EPA fact sheet. Okay. So how do we reconcile what EPA has said about no consensus on the appropriate discount rate and OMB's instruction to run it with three rates? Well, I'm not sure. I mean, the commission has followed, has agreed with the EPA's position that there, that there is no agreement. I mean, particularly with respect to greenhouse gas emissions and how they should be factored in and regulated. I mean, that's generally EPA's bailiwick and the commission has, has agreed with their position that that the disagreement as the appropriate discount rate really devalues the usefulness of the tool in, in a project specific analysis. Okay. And you were going to, I don't want to, I don't want to stop this line of questioning. No, no, that's fine. Thank you. Sure. You were going to talk about the, the effect of the project. Yes. So, so the fact that the ANOVA project, assuming the surrender is accepted, obviously that will lessen some of the cumulative impacts. I am not aware that the commission intends to update its environmental impacts to the Rio project in light of the cancellation with the proviso. This just happened yesterday, but, but that's, that's my understanding. So we believe that the claims, the overall claims relating to the reasonableness of the commission's decision to use social costs, carbon, environmental justice, ozone analysis are, are, can be decided now by the We do believe the, the redesign moots, certain claims that have been raised by petitioners, all those claims relating to whether the commission should have looked at a five train design. It's our position. They are moot. We appreciate that Sierra club and other petitioners have an issue with how we did that analysis, but that's a separate case. Whether we should have looked at a five train design we submit is moot as are those claims relating to the purported excess capacity associated with a six train design because there is no longer under the current design, any purported excess capacity to the five trains that the commission has approved in the redesign, their collective capacity is 27 million tons per year. And that is the authorized export limit. Is that, is, are they with the redesign project is the limit on the Redesigned the authorized export limit is identical. That has not changed the authorized export and the capability of the project. The DOE authorized the export of 27 million tons per year. And that is the, the, the max capacity, if you will, of the current five train design. So nothing changed. That's no more and less smooth than it was before. Correct. Okay. So then I didn't understand your second point as to mootness because the first one I get, which is that, well, there were a number, there were a number petitioners have raised the claim that given the sort of the, the, the updated technology. So the genesis of the claim is that the, the technology that would have allowed the developers to transform gas into LNG has improved such that each train, instead of being able to do, I think it was 4.5 tons per year can now do 5.4. So, uh, Sierra clubs claim was that, well, you should look at that excess. If there were six trains here, there's more capacity there than has been authorized for export. You should look at that. Those in the potential of that future, uh, increment being produced and exported now. And there is no, that's my point. There is no more, uh, variance between the capabilities of the, uh, equipment that's been, been approved for use and the because of the reduction from six to five. Correct. Okay. Um, I have one unrelated question, which has to do with the vessels, which has come up a few times today. So as I understand the commission's position, it's not, there's nothing that suggests that the commission in disc and addressing cumulative impacts is not supposed to consider the contribution of vessels. It's that if we're talking about mitigation, of course, the commission can't impose mitigation measures because the commission just doesn't have the authority, but in terms of taking account, taking into account the vessels for purposes of cumulative impacts, the analysis analysis that you've done, which you say is sufficient already takes those into account, presumably on the premise that those are appropriate to take into account. Correct. The argument or brief was with, with respect to mitigation as to the two cases, judge Ginsburg referenced the commission's position with respect to those is that those holdings relate to take out of our obligation, the scope of review, the upstream production impacts and the sort of combustion overseas in these types of cases. But yes, the commission did look at, uh, considered LNG traffic in its, um, cumulative impact analysis. And I did not believe it was jurisdictionally barred to from net them at the cumulative impact. Is that only in the rehearing order? Well, I think that I don't, the commission did not, the orders don't discuss the import of the two cases that you cited upon it, the scope of it's. No, no. But the point you're just making now that, that they take account of the vessels with in respect of cumulative impact. Yeah. So, so the ozone there, there was a specific ozone discussion and this is page, this is in the EIS, um, at page four dash four 78, there was a specific discussion of the, um, the three projects, just the projects themselves, the stationary emissions. Um, and then at the end of that section, also noted that there would be carriers coming up and down that they would have emissions, uh, that these mobile emissions would occur of a large area and did note that there could be, that could result in long-term and elevated emissions. What it did on rehearing in response to those rehearing requests is kind of put a finer point on that and say, okay, let's, you're right. That would, we didn't do the math with respect to that. Let's do it. And it took a conservative approach and put those numbers in the rehearing order. Right. And not in the initial order. And I'm not correct because yes, in terms of where we'd look. Yes, because the, yeah. And that's paragraphs 52 to 55, roughly of the rehearing order. Yes. Yeah. Okay. Thank you. Let me make sure my colleagues don't have additional questions for you. So, so on, um, environmental justice, um, can you just explain, um, I guess how you would articulate where the commission ultimately came down on whether there's a disproportionate impact or not? I think the commission, and this is paragraph, um, 69 of the, of the rehearing order, um, that because all the impacted communities are environmental justice communities, um, the, the impacts will not be disproportionately concentrated anywhere. They'll be uniform throughout these, um, throughout these communities. Um, but, but again, it didn't stop there. And I think that's our, that's the commission's fundamental point that it went on and looked at how, uh, the demographic makeup of those populations would amplify any previously identified effects. And what about the other, um, the, the issues that petitioners say that, that the commission did not look at like age disparities, lack of access to healthcare? Well, I think it, it did with respect to, um, the primary health concern, which is ozone. The percentage of population that was elderly or young, and that's, and this could be, uh, potentially susceptible. It looked at County and, uh, statewide for that I'm looking for the, uh, paragraph numbers. It did take all that into account and found that, um, those factors wouldn't amplify the impact of potential ozone exposure, uh, any more than would otherwise be or, uh, through 77 of the rehearing order. So when, when the commission says, let's go back just a bit to a health effects that they wouldn't be amplified because of the demographic composition of the immediate vicinity amplified compared to what? Well, I think that there's the commission looked at the, um, compared to what, what the EPA, um, you know, guidelines provide that above there could be health impacts above, um, the, the national ambient air quality standard 70 with respect to, um, with respect to ozone and the commission looked at whether, um, you know, it would sort of what would otherwise be accepted. So there's general, there's general literature about how ozone, uh, impacts, um, humans. Uh, and then it looked at whether, um, sort of using that as a baseline, the general impact to the, to the general population, whether it would be amplified in some manner. So you're saying the general population was the comparator. Well, I guess, I guess in a way that the commission didn't, didn't use a, a, a reference group, and it sort of explains this at, at paragraph again, in paragraph 69, in terms of assessing where the impacts would be concentrated, um, or determine whether they're disproportionate in terms of numbered. It did use, it did, yes, use a comparison to assess how the effects would, uh, would impact the affected communities, but not compared to anyone else. Well, because yes, it didn't, it didn't look, it didn't believe it could make the conclusion that the, uh, impacts were disproportionately, um, hitting any particular, the environmental justice as compared to a broader community, because all the impacts were there, but then, yes, then look to see whether comparing it to the general population, whether the expected, whether the potential impacts, um, would, um, would affect those communities in a, in a particular manner. And when you say general population, you mean general population of what? Well, I think with respect to, um, with respect to, uh, ozone, the commission looked at county and state data, um, in particular to look at, um, asthma rates and, uh, chronic lower respiratory disease, um, mortality impacts, um, percentages of the population, the prevalence of asthma. Um, so I think those were the comparison groups in looking at how the impact affected the, uh, the environmental justice communities. Okay. So I guess I'm, I guess I'm still a little confused. Is it that there is the commission concluded that there was no disproportionate impact because the only people who would be affected were minority and low income. And therefore you couldn't say that they were disproportionately impacted because they're the only ones impacted, or they said that there was no disproportionate impact because if you compare, um, the impacts that will happen to that, that, that minority and low income community to what would happen if, um, I guess to, to, I guess, uh, the epidemiological or other evidence we have for the county or state as a whole, they're not going to be any worse off. I'm, I'm just correct. It is standing or what, what the commission articulated or concluded here. It's, it's the second formulation you posited. And, uh, and again, this is in paragraph 69 of the rehearing order order says again, because all the affected communities are environmental justice communities. Uh, the impacts will not be disproportionately concentrated on those communities. They'll be, they'll be uniform throughout, but then the commission go on, goes on to say, but it is possible regardless of the uniformity that a project's impacts to these communities, um, arising from certain change in the environment or the risk or rate of exposure to a pollutant would be disproportionately high and adverse if amplified by factors unique to the population. And so, and then that's what it did. It looked whether there were unique to these impacted communities that would amplify, uh, the, the project effects in a way that would make them high and adverse. It doesn't at all. The key sentence is the one I think that you're pointing to, which is because here all project to failed affected populations or minority or low income populations are both. That's the sentence that correct. And the follow on, I think is where the commission reiterates the, um, the, the, the second sort of formulation that, that judge Wilkins just spoke. Right. And am I right in my, in, in believing put aside the second sentence for a second, but just on the first sentence, the dispute here is that from the commission's perspective, in order to say that, because here all project affected populations are minority or low income populations are both, then it just, it depends on how broad a swath of population we're taking into account and making that statement. Because if you took to account, it took into account the entire population of the country, something like that, then you'd have a different comparator. Whereas here, the way the comparison is done is such that the commission would say, well, it doesn't matter if you shift things around a little bit, because no matter where you shift things around, you're still going to have the same degree of disproportionate impact on, um, on, uh, minority and low income populations. That's right. I mean, yeah, the commission said that it did look at alternatives after identifying that all the impacted communities are, are environmental justice communities. It did look at alternative sites. Um, but there would be no, that really wouldn't change the balance because most of, most, if not, I believe 13 of the 14, uh, counties that, that border the channel are environmental justice communities. So, uh, so there was no, no viable alternative that would have, um, changed, changed it number wise, uh, in terms of the percentage of impacts. Um, so then the commission looked at, uh, again, how the demographic features would amplify the impacts. 13 or 14 counties or so? This is, I don't want to get over my skis here. This is, I'm recalling something from the Texas and Innova border. So, so let me retract it. What I do know is the commission looked at alternatives, um, in this case and found that none of the alternative sites that were looked at, uh, would have any less environmental justice impacts than, than, uh, was proposed. Okay. Let me make sure my colleagues don't have further questions for you, Mr. Kennedy. Thank you. We'll hear from intervenors council, Mr. Longstreth. Thank you, your honor, uh, John Longstreth representing respondent intervenors, Rio Grande terminal and Rio Bravo pipeline. And I just want to address a couple of the issues from the, perspective of the project developers. Um, first, um, I, I think there was a statement, um, and I can't remember which of the arguments was in, but I think by the petitioners council, um, that we have not, um, that we, uh, said we'll build six trains. I want to make very clear. It's, it's absolutely set that we're only going to build five trains. I'm not sure why there's still a speculation being put in front of the court that there might be six trains. Um, we now have an authorization for five trains. Um, the project just was pointed out was always going to be a 27 million ton per annum project. It is still a 27 million ton project and a project. The only difference is six strains to five trains. And I think as was also pointed out earlier, the question is, well, what are the environmental impacts of that going to be? Um, they will be positive. And I think one of the ways you can know they're positive is it was the petitioners themselves who are arguing that a five train, uh, alternative should be considered because it was environmentally, um, preferable. Um, they do have an issue. Okay. Now that it's five trains, you know, could they have moved the fence line somewhere or other issues that are presented in their follow on appeal? Um, we think those are going to be, um, you know, quite frankly, trivial, but in any event, it's, we are going ahead with this project now as a 27 million ton per annum project, as was authorized by the department of energy as in the public national interest. And as, um, was approved by FERC, um, we're just doing it with this slightly different design and we do, there was a, you know, some questions early on about rightness, but as been pointed out, everybody wants this case to go forward and be decided now, um, uh, on these issues. And that's certainly where we are now. Um, we think the, well, not, not everybody. I thought the commission thinks some of the claims are moot. I'm sorry. We want, we want to go ahead and have, yes, that's right. I'm sorry. I, we want to go and have it and have a decision on all the remaining claims, which are not moot. The only thing that's moot is the six to five claim. The rest of it is all in front of you and should be decided. That's correct. Um, the, where, where is the project in terms of scheduling? Is it construction begun? Um, and I know it has not begun. And one of the reasons is, and this is the reason I think why it's important to have a decision, um, you know, financing decisions sometimes depend on the certainty of the regulatory permit. Um, and there will be more certainty to the regulatory permit when the Sierra clubs, uh, challenges are denied. So in what sense, in what sense would vacature as opposed to remand without a vacature have any deleterious effect? Um, because it would create, um, because it would vacate the permit. We would no longer have a permit in place and people looking to invest in the project customers, uh, looking to do business with it would not, would be less likely to deal with a project if it didn't have a permit in place. I suppose it takes another year to complete the tasks on remand if there is a vacature. So that would set you back a year in terms of the financing, but also set you back a year in terms of the construction. So nothing's changed. Well, well, what's changed? No, what's changed is that the project is now delayed for a year. The whole project is delayed. Correct. Correct. But why is that particularly disruptive of the project? Yeah. I graduated obviously delays it. That's always true. That's a constant, right? If we, if there's a, uh, if there's a vacature and sometimes there's a vacature and sometimes there's not, and it depends on whether something other than a constant, namely that it would be in some way destructive or, uh, uh, ill-advised to stop things for a year. Yes. I mean, it would, it would, it'd be an incredible burden on the project developers. If all of the plans that have been, um, undertake everything that's going forward, all of the discussions, um, uh, we're having with, uh, uh, just with, with these customers, we're not, we're not allowed to go forward. I mean, we're not, one of the ways to get contracts signed is to have the permit in place. The permit is not in place. It's going to put the entire project on hold for a year. I can't imagine a greater disruption to a project developer than for a year they can't go forward with it. Um, so that is why we think, uh, isn't there, isn't there uncertainty anyway, because of the other, because there's a follow-on petition with respect to the project redesign? Um, I don't want to look too much like an advocate here and answering the court's question. We think the uncertainty from that follow-on petition is pretty much negligible. Once, as was pointed out earlier, if this EIS is affirmed, then the minor issues that are related in that follow-on, I think are going to be relatively trivial. So I think there's no comparison between the two. There'd be no comparison, for example, between a delay or a vacatur here, um, and, uh, the, uh, remaining uncertainty with that follow-on petition. And all the same, go ahead. So you would talk to customers and finance sources and say, yes, it's true, there's still a challenge pending, but we don't think it has merit. Um, we think, and, and we think in light of the fact that the environmental impact statement for the entire 27 million ton granite project, with all the issues that have been raised, including all the issues that were considered below that have been abandoned by the petitioners, all the ones that have remained, when you compare all of that uncertainty to the uncertainty that's left with essentially the decision on whether we should move the fence line now that we only have five trains rather than six trains, um, it's, it's just a night and day difference. And I believe that our customers would see that. I can't speak for them, but I think just plausibly, if you're thinking about how these projects go forward, that would be the result. Yes. Might you just move the fence line? Um, we've, we're getting into the next appeal and I, I really don't want to redo that as I think, um, I can't remember which of the FERC council mentioned that I don't want to say wrong, say it wrongly, but we have decided by leaving the fence where it is, we can use that as a, uh, uh, lay down yard for the equipment so that that's the best way to handle it. Um, to the extent that there were other alternatives, that's for the, uh, that that's the new appeal. Um, okay. And we think what you can do there. Um, we also think that the, uh, um, again, we understand FERC just got the, um, news on the ANOVA project, uh, yesterday, and obviously they can't commit to this board as to whether they have or not made a decision, not made a decision as to whether any supplemental analysis will be needed, but, you know, supplemental analysis needed if there are changes to this project, that's another project. And most that's just part of the background, um, in the cumulative impacts analysis. There are plenty of other things that are part of that background, even beyond the terminals, you know, if SpaceX decides that, you know, they're, they're close by, you know, they, they put a rocket up, don't put a rocket up. So certainly you don't have to redo the analysis for everything. So our position will be, um, certainly that there's no supplemental impact, um, uh, required and no further analysis needed for ANOVA coming out. I think petitioner's council said that was a relatively small amount of the emissions anyway. So we don't think that affects anything here too. Um, I think I've already mentioned, you know, that the design change, uh, will, uh, reduce the impacts in this case. We don't have to worry about that. If you affirm this, we'll be fine going forward. Um, there was a little question about the, um, uh, the regulation and, you know, uh, 1502, 22 and 21 and all, um, and, uh, uh, you know, you, you beat up perk on it a little bad. I don't really want to offer to be beat up myself on it. Cause we didn't mention it, but I would point out that that regulation, um, it says you have to have something that's essential to a reason choice among alternatives or specific situation where you have to use that if you use that essential to reason choice model alternatives language. Um, and also I think, and this is what the council said as well. The question in that is you're really trying to force the agency to consider the scientific consensus to see some of it, whether something is a useful or available tool. We have now a long discussion from the agency. It's not like they ignored the issue of whether social cost of carbon was an available tool under the scientific consensus. They had, um, a significant discussion of the factors, why it's not, those are factors that have been consistent in the commission's, uh, precedent on this. Um, you know, there's a little bit of a discussion about, well, do I have to look at this order or that order? And part of that is the reason that, you know, this, this came up, you know, there's been a history of this going back of this issue, going back to, you know, several previous court decisions on this FERC has consistently made this argument as to why social cost of carbon isn't useful. It's been affirmed two or three times on their hearing petition. The petitioners didn't even address those three issues and they just, but they said, well, what about this? Why don't you use, uh, um, some metric here? And they said, well, we've told you why we're not using social cost of carbon. And then I don't, I'm not, I'm not following the, the argument, um, on the essential to a reason choice, because I thought essential to a reason choice is in 1502.22a, right? Yeah. I didn't, I thought that the argument being made was under 1502.22b. Uh-huh. Yeah. But I, I think that's what, I think that's what the standard, I think that's what the standard is to apply to whether, where the regulation applies. I mean, at least my understanding was that that applied to the entire regulation. Okay. Um, let me make sure my colleagues don't have any additional questions for you, Mr. Longstreet. I was finished. Oh, thank you. Okay. Thank you, Mr. Longstreet. Mr. Matthews, we'll give you two minutes for rebuttal. I will race through picking up where we left off. Um, council for interveners argued that we hadn't raised issues that are, uh, that are relevant to the draft EISs, uh, for all of these projects argued about social cost of carbon, and they addressed issues like discount rate, all of the issues FERC has previously given, uh, for not using social cost of carbon. The certificate orders here didn't say anything about discount rate. Uh, the orders that the certificate orders cited didn't say anything about concerns about discount rates. So from everything we could tell from the certificate orders, FERC had agreed that the discount rate issue was no longer an issue at this point, which is why we didn't specifically call out uncertainty about discount rates in our FERC didn't seem to have any concerns with what we said. So we moved on. Um, so we, we did in our hearing requests, challenge every rationale that FERC actually articulated in the certificate orders here. And on this course, uh, precedents interpreting the exhaustion requirement under the natural gas act. Um, we raised every issue that we had notice of. And so that's, that's not a concern here also on social cost of carbon and the unpublished Sierra club versus FERC case about the Corpus Christi terminal. Uh, we did brief 1502.22 in that case, but the court's unpublished decision didn't address 1502.22. Uh, and subsequent to that case, we have concessions from FERC that implicate the predicates for 1502.22. We have FERC, uh, having acknowledged on its remand and disabled trail case, um, that the social cost of carbon remains generally accepted in the scientific community, which was not a FERC position that we had, uh, in the Corpus Christi case. And we have FERC responding at other FERC orders and in the the social cost of carbon really is built on an assessment of physical effects. Um, just jumping through a couple of other issues, um, on the redesign, uh, they still plan to build a fence line to leave space for lays a foundation for a sixth train and, uh, Rio Grande has still told us investors, you know, it's given revenue forecasts about the income that would come from future operation of a sixth train. Um, I'll... Mr. Matthews, what is, how big is the footprint for that sixth train? Uh, nobody has broken out exactly the number of acres specific to the sixth train. The overall project footprint, I believe, is about 900 acres. Uh, we were principally concerned with the 200 acres of wetlands that would be filled there. Right, right. But the terminals, I mean, it's a tiny fraction of the 900 acres, right? Eyeballing the map, I'm guessing that it's about 50 acres, but it, I want to confess that that's me eyeballing a map. Um, you know, even if it's just avoiding 20 or 30 acres of wetland impact, uh, we'd contend that that's a significant issue that, that impacts about, uh, cases about impacts to wetland and whether wetland fill is appropriate to get litigated for that scale of impact all the time. It'd be useful, I think, I don't know, maybe not for the other part, the other judges, but it seems to me the court would find it useful to know what we're talking about. We agree, which is why we asked Kurt to prepare an analysis and all this record, and I don't see anything certainly not highlighted with regard to, uh, what space, how much space is made available by going from six to five. We, we absolutely agree, which is why we have called on for, you know, sensor supplemental EIS requests. I don't know either what, how big a train is or whatever. I get, I have a map, but I don't have a map that is to scale that tells me, you know, exactly. And I don't know, I mean, I could tell you with a ruler and the map, what I guess the train would be, but, but I don't know whether or not you actually reclaim all of that space and whether all of the reclaimed space could be avoided wetland. Maybe we can hear from Mr. Longstreth before we're through again on that. Um, I just mentioned that there's nothing in the record that tells us how much space could be saved and specifically how much wetland impact could be avoided by, shrinking the overall fence line and footprint. Um, also on the redesign, all of our claims about the pipeline design are not implicated by the redesign here at all, that the pipeline claim, where we argue that 4.5 billion cubic feet per day of pipeline capacity is vastly higher in proportion to the proposed terminal output than for any other pipeline, uh, NLNG terminal. And that FERC has not offered any specific facts explaining why that ratio is so skewed here. Um, given that the output of the terminal, they did cite other instances with a similar radius. Oh, um, they cited other instances about how much gas you could put through a certain diameter pipe, but the overall question of four and a half billion cubic feet per day of supply, however, you get it there to terminal output of 3.6 billion cubic feet per day, FERC speculated that there are different factors like terrain, uh, or temperature that might influence how, what that ratio needs to be, but FERC didn't apply any of those factors here. They didn't say here it's 10 degrees warmer than it is somewhere else. And that changes the ratio, but there's just no facts, uh, about the pipeline. So that claim is certainly not moved by the design changes, um, on vessels. I think they just, I think they relied on the companies for that, right? So what they made a calculation of what the pipeline should be, and we're not going to second guess it. That's FERC's assertion, but there's no citation to that calculation. I mean, what you're suggesting is maybe they foolishly overbuilt the capacity of the pipeline. That's one possibility. Uh, and our claim is that FERC needs to actually scrutinize whether the design is warranted here, especially where the capacity of the pipeline is being used as a reason to rule out less impactful alternatives. They're saying that the reason they can't build one pipeline instead of two is because they need the full four and a half billion cubic feet per day. Um, and so that's, that's an important question to get right. And FERC didn't demonstrate that FERC applied any scrutiny there. I see that I'm over my time just on the vessels point. Um, regardless of whether or not FERC was required to consider the cumulative impacts of vessel emissions, and we contend that it was, but, but FERC chose to do so. And once FERC decided to do that, FERC was required to do that in a non-arbitrary way. This court's decision and communities against runway expansion lays that out in the environmental justice context, but it applies here as well. Um, if there are further questions, I'm happy to elaborate. I don't think so. Thank you, Mr. Matthews. And then with Mr. Longstreet, since you've been specifically invited to address this question about the, uh, about the, um, the footprint on the sixth train, why don't you just take a second to do that? Thank you. I was trying to say that I probably could. If you look at, um, I guess there are two places you can look at, uh, for it. Um, in JA241, the original application, um, says that each liquefaction train will have an approximate footprint of 830 feet times 1020 feet, or roughly 846,000 square feet. That's on 241. And then, um, if you look at the redesign rehearing order, that was the one that was submitted in the 28J, it says 20 acres. This I think so. Yeah. Um, I think justice Ginsburg said this was probably going to be a tiny fraction and, uh, um, I'm sorry, the site for 20 acres, uh, the 20 acres is, um, the paragraph, uh, 14 of the rehearing design order. Um, so you're, you're, you're just under 2%. So, so I think judge Ginsburg speculation that this issue they're talking about in the following appeal affects a very, very small portion of the area is correct. And I don't want to overstay my invitation. Thank you, counsel. Thank you to all counsel. We'll take this case and the other related cases under submission.
judges: Srinivasan, Wilkins, Ginsburg